ORDERED.

**Dated:  March 31, 2026**

Lori V. Vaughan
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
www.flmb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Bravo Brio Restaurants, LLC, *et al.*, | ) | Case No. 6:25-bk-05224-LVV |
| | ) | Jointly Administered[1] |
| Debtors. | ) | Chapter 11 |
| | ) | |

**MEMORANDUM OPINION ON APPROVAL OF DEBTORS'
DISCLOSURE STATEMENT, CONFIRMATION OF DEBTORS'
JOINT PLAN OF REORGANIZATION AND ESTIMATION OF CLAIMS**

Creditors inKind Cards Inc., inKind Warehouse Facility LLC, and inKind Credit Fund LP (collectively, "inKind") challenge confirmation of Debtors' Plan of Reorganization and approval of the Disclosure Statement on various grounds and have voted to reject the Plan. First, however, the Court must estimate inKind's claims. inKind asserts they possess a fully secured claim of $11,932,899 based on the purchase of $7 million in credit for use at any of the Brio Bravo restaurants even though Debtors have already honored more than $7 million in credit. The Court concludes inKind is not entitled to any recovery under the terms of their agreement and therefore

---

[1] Jointly administered cases: Bravo Brio Restaurants, LLC, Case No: 6:25-bk-05224-LVV; Bravo (Louisville), LLC, Case No: 6:25-bk-05225-LVV; Brio (Cherry Hill), LLC, Case No: 6:25-bk-05226-LVV; Brio (Irvine), LLC, Case No: 6:25-bk-05227-LVV; Brio (Texas), LLC, Case No: 6:25-bk-05228-LVV.

1

estimates its claims at $0. Further, the Court rejects inKind's objections and will confirm Debtors' Plan of Reorganization.

**Background Facts**

The relevant facts are undisputed. Bravo Brio Restaurant LLC ("BBR") owns and operates restaurants nationwide under two brand names: Brio Italian Grille and Bravo! Italian Kitchen.[2] In 2020, BBR acquired its assets through a § 363 sale in the chapter 11 bankruptcy of FoodFirst Global Restaurants, Inc. ("FoodFirst").[3] Specifically, FoodFirst's senior lender GPEE Lender, LLC ("GPEE") prevailed at auction via credit bid and assigned the sale rights to BBR who took title to the assets and assumed $23 million of GPEE senior secured debt.[4] Bravo Brio Holdings, LLC ("Holdings") is the sole owner of BBR.[5] Holdings is owned by Earl Enterprises, Corp., LLC ("Earl Enterprises") and a Brazilian investment fund called GP.[6]

BBR is the sole owner of six subsidiary entities.[7] BBR refers to its subsidiaries as "special purpose" entities that are associated with particular restaurants. Each subsidiary is signatory to the lease of a specific restaurant location, holds the associated liquor license, and has interests in the furniture, fixtures, and equipment of the restaurant.[8] The subsidiaries may have some of their own trade debt, but all operations, including staffing and payroll, are handled through BBR.[9] Of BBR's

---

[2] Doc. No. 251, Disclosure Statement.

[3] *In re FoodFirst Global Restaurants, Inc., et. al*, Case No. 6:20-bk-02159-LVV, (Bankr. M.D. Fla. filed Apr. 10, 2020).

[4] Doc. No. 251, Disclosure Statement; Debtor's Exh. 4; Doc. No. 430, 1/27/26 Hr'g Tr. 40:19. On the Petition Date, GPEE was owned by GP, a Brazilian investment fund, and Earl Enterprises. Doc. No. 430, 1/27/26 Hr'g Tr. 41:4. Earl Enterprises managed Debtors day to day operations. *Id*. at 41:13 By the confirmation hearing, GPEE ownership consisted of GP, Earl Enterprises and Champion. *Id.* at 97:9. Champion funded $3.5 million into GPEE which GPEE used to fund a DIP loan during the case. *Id.* at 41:17. Upon confirmation, Champion will fund an additional $4.5 million into GPEE and R&R Brands, an affiliate of Champion, will oversee day to day operations of the reorganized debtors. *Id*. at 41:17.

[5] Doc. No. 251, Disclosure Statement; Doc. No. 430, 1/27/26 Hr'g Tr. 49:21.

[6] Doc. No. 430, 1/27/26 Hr'g Tr. 97:9.

[7] Doc. No. 251, Disclosure Statement.

[8] Doc. No. 251, Disclosure Statement; Doc. No. 430, 1/27/26 Hr'g Tr. 81:12; 85:14.

[9] Doc. No. 251, Disclosure Statement; Doc. No. 430, 1/27/26 Hr'g Tr. 81:12.

six subsidiaries, four are debtors in this Court: Bravo (Louisville), LLC, Brio (Cherry Hill), LLC, Brio (Irvine), LLC, and Brio (Texas), LLC (collectively "Debtor Subsidiaries" and together with BBR, the "Debtors").

On August 25, 2025 ("Petition Date") Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code commencing these cases which are being jointly administered.[10] As of the Petition Date, BBR operated 48 restaurants nationwide and employed about 4,000 individuals.[11] One of the restaurants is operated under a management agreement while the rest are leased.[12]

The inKind Relationship

inKind describes itself as a restaurant financing company and alternative to traditional financing.[13] inKind purchases credit from restaurant operators and sells the credit to consumers via inKind's smartphone application.[14] Consumers then redeem the credit at restaurants to purchase food and drinks.[15] inKind's profit is derived by purchasing credit from restaurant operators at a substantial discount and selling it to customers for close to face value.

On July 21, 2023, BBR and inKind entered into a Credit Purchase Agreement whereby inKind purchased $5 million in credit from BBR for $2.5 million.[16] Thereafter, the Credit Purchase Agreement was amended to purchase another $2 million in credit for $1 million (as amended, the "Agreement").[17] As a result, inKind acquired a total of $7 million in credit from BBR. No other

[10] Doc. Nos. 1 and 69.
[11] Doc. No. 251, Disclosure Statement.
[12] Doc. No. 251, Disclosure Statement.
[13] Doc. No. 155.
[14] Doc. No. 155.
[15] Doc. No. 155.
[16] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement).
[17] Debtors' Exh. 3, Proof of Claim Exh. B (1st Amendment to Credit Purchase Agreement).

relevant changes were made to the Agreement. BBR's subsidiaries are not parties to the Agreement.

While the Agreement imposes obligations on both parties, at its core it requires BBR allow inKind customers to redeem credit for the purchase of food and drinks at BBR's restaurants. The Agreement further requires BBR to allow customers to redeem credit sold by "Sister Merchants"—defined as Buca, LLC, PB Restaurants, LLC, and OCS Restaurant Holdings, LLC—at BBR's restaurants.[18] The Agreement does not specify the amount of credit inKind purchased from the Sister Merchants or limit BBR's responsibility to honor the credit. If a Sister Merchant defaults, BBR remains obligated under the Agreement to honor the Sister Merchant's outstanding credit. BBR does not receive any additional compensation for accepting credit sold by its Sister Merchants. Instead, the Agreement provides that the restaurants work this out amongst themselves independently of inKind.

For the first year, BBR could buy back the credit at the rate of $1 for every $2 in credit—the same price at which it was sold. The Agreement includes language granting inKind a security interest in all the present and future accounts receivables and personal property of BBR to secure performance under the Agreement. However, it then states that inKind may file a UCC-1 financing statement "to perfect its security interest" upon an event of default. An event of default includes refusal to "honor Credit to be redeemed" and failing to cure such default. There is no reference to Sister Merchants in either the sections titled "Events of Default" or "Security Interest." Upon an event of default by BBR, inKind is entitled to liquidated damages equal to $0.65 times the amount of purchased credit not yet sold or redeemed.

---

[18] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 5.h. and 5.i.).

The Agreement also includes a section titled Limitations of Liability which provides that BBR's and its affiliates' aggregate liability is limited to $5 million and inKind's aggregate liability is limited to $2.5 million.[19]

Rejection of the inKind Agreement

On September 5, 2025, Debtors filed a Motion to Reject inKind Agreement ("Motion to Reject").[20] Debtors argued that the Agreement was burdensome because they were honoring $75,000 a week in credit without receiving revenue from those sales. inKind objected arguing that the Agreement was not an executory contract but a security agreement, and that, if it was executory, rejection was not a proper exercise of Debtors' business judgment.[21] The Court granted the Motion to Reject.[22] In an oral ruling, the Court held that the Agreement was executory under the Countryman definition because obligations remained on both sides and that the Agreement was not a security agreement.[23] The Court further ruled rejection was a proper exercise of Debtors' business judgment considering the loss of revenue resulting from the continued redemption of credit.

After the rejection, inKind filed three proofs of claim in each of the Debtors' bankruptcies, which inKind later amended. In each case, the three identical proofs of claim—one for each inKind entity named in the Agreement—seek $11,932,899 and assert a security interest in Debtors' assets (the "Claims").[24] On January 19, 2026, Debtors filed an Omnibus Objection to inKind's Claims ("Objection to Claims") arguing that the Agreement did not create a debt obligation and even if it

---

[19] While these amounts are identical to the credit sold by BBR and the purchase price, this provision was not modified when the Agreement was amended.

[20] Doc. No. 102.

[21] An evidentiary hearing on the Motion to Reject occurred October 15, 2025.

[22] Doc. No. 191.

[23] The Court made the oral ruling at a hearing on October 30, 2025.

[24] To be clear, inKind filed a total of 15 proofs of claim, all identical, 3 claims in each of the five bankruptcy cases.

did, any debt obligation had been satisfied.[25] In response, inKind filed an Emergency Motion to Estimate and/or Temporarily Allow Claims of inKind Cards Inc., inKind Credit Funds LP, and inKind Warehouse Facility, LLC (the "Motion to Estimate").[26]

<u>Debtors' Disclosure Statement and Plan of Reorganization</u>

Debtors filed their Disclosure Statement ("Disclosure Statement") and Plan of Reorganization ("Original Plan") on December 9, 2025. On December 10, 2025, the Court entered an Order (I) Conditionally Approving Disclosure Statement, (II) Scheduling Combined Disclosure Statement and Confirmation Hearing, (III) Setting Related Deadlines, and (IV) Setting Deadline for Filing Administrative Expense Applications (the "Scheduling Order").[27] Under the Scheduling Order, Debtors were required to serve the solicitation package to all parties entitled to service under Rule 3017(d) and to the parties identified in Local Rule 1007-2 no later than five days after entry. On December 15, 2025, Debtors filed a Declaration of Mailing and Certificate of Service declaring that the Disclosure Statement, Original Plan, ballot form and other solicitation items were mailed to the appropriate parties by a third-party servicer—BK Attorney Services, LLC—an approved bankruptcy notice provide authorized by the Administrative Office of the U.S. Courts.[28] Attached was also a declaration of Miles Wood with BK Attorney Services, LLC attesting that the documents were deposited for delivery by First Class mail with the United States Post Office to the parties identified in an attached mailing list attaching what appears to be a matrix generated from the Court's CM/ECF software. Despite this, the solicitation package received by inKind did not include the Disclosure Statement.

---

[25] Doc. No. 332.
[26] Doc. No. 342. inKind filed the Motion to Estimate on January 23, 2026.
[27] Doc. No. 255.
[28] Doc. No. 263.

Debtors later filed a Second Modified Plan of Reorganization (the "Plan") which is the final version of the Plan which they seek to have confirmed.[29] While not called a joint plan, Debtors' Plan provides for the reorganization of all the Debtors, not just BBR.[30] The Plan has ten classes consisting of one (1) priority claims class, seven (7) secured claims classes, one (1) unsecured claims class, and one (1) class of equity interests. Except for the class of equity interests, the Plan provides for the repayment of allowed administrative, priority, secured and unsecured claims as described therein.[31]

All classes of the Plan are impaired. Class 3 is the claim of inKind. Under Class 3, Debtors dispute that inKind holds a valid and perfected security interest on any assets, but if it is determined that inKind holds valid and perfected security interest, the value of those assets do not exceed the value of GPEE's allowed secured claim, and therefore, pursuant to 11 U.S.C. § 506, inKind's claims are wholly unsecured. To the extent that inKind is deemed to hold an allowed claim, the Plan provides such allowed claim shall be treated in Class 9.

Class 9 consists of all allowed general unsecured claims for each of the Debtors. In full satisfaction of their claims, creditors will receive a *pro rata* distribution of $750,000 from the sale of the liquor license held at BBR's Freehold, New Jersey restaurant. Distributions to allowed unsecured claims will be made on the Effective Date or, if an unsecured claim does not become allowed before the Effective Date, then the distribution for the claim will be made on the date the allowed amount of the claim is determined by final order of the Bankruptcy Court.

---

[29] Doc. No. 400. Debtors filed the Plan on January 27, 2026.
[30] Although the Plan defines the "Reorganized Debtor" as solely BBR, the Debtor Subsidiaries were inadvertently omitted from the definition. It was Debtors' intent that all entities be reorganized. See 1/27/26 Hr'g Tr. 115:2 and generally Disclosure Statement and Plan.
[31] Doc. No. 400. The Plan provides that BBR's equity interests shall vest in GPEE or its designee, on the Effective Date and Bravo Brio Holdings, LLC shall not receive or retain any property under the Plan.

inKind voted to reject the Plan.[32] All remaining classes—holding claims totaling over $32 million—voted to accept the Plan.[33] inKind also filed an objection to confirmation of the Plan which it later supplemented ("Objection to Confirmation").[34] On the eve of trial of confirmation of Debtors' Plan, inKind filed objections to proofs of claims filed by GPEE in the Debtor Subsidiaries' cases and an objection to Debtors' ballot tabulation.[35] inKind also initiated an adversary proceeding by filing a complaint against GPEE seeking to subordinate GPEE's secured claims to below the status of general unsecured claims, recharacterize GPEE's secured claims as equity and disallow any claims of GPEE.[36]

The Court held a trial on January 27, 2026, to consider final approval of the Disclosure Statement, confirmation of Debtors' Plan and the Motion to Estimate. The Court heard testimony from Debtors' general counsel, Jeffrey C. Sirolly, and Debtors' bankruptcy counsel, R. Scott Shuker.[37] Debtors currently have 43 restaurants that remain in operations with approximately 3,000 employees.[38]

## Discussion

Estimation of inKind's Claim

Although often cited together, § 502(c) and Rule 3018 serve two distinct purposes. Under § 502(c) the Court must estimate for the purpose of allowance any unliquidated or contingent claim the liquidation or fixing of which "would unduly delay the administration of this case." Estimation of a claim under § 502(c) allows a court to administer the bankruptcy estate without undue delay

---

[32] Doc. No. 355.

[33] Doc. No. 355.

[34] Doc. Nos. 359, 380. inKind filed the Objection to Confirmation on January 23, 2026, and supplement on January 26, 2026.

[35] Doc. Nos. 377, 378, 379, 386 and 396. inKind filed the objections on January 26, 2026.

[36] *inKind Cards, Inc. v. GPEE Lender, LLC, (In re Bravo Brio Restaurants, LLC),* Case No. 6:26-ap-00013-LVV, (Bankr. M.D. Fla. filed Jan. 26, 2026).

[37] Mr. Shuker's testimony was limited to service of the Disclosure Statement.

[38] Doc. No. 430, 1/27/26 Hr'g Tr. 43:15 and 44:25.

that could be occasioned by lengthy or complex litigation. A claim estimated under § 502(c) is allowed in the estimated amount for all purposes. *In re Trigeant Holdings Ltd.*, Case No. 14-29027-EPK, 2015 WL 1514175, *2 (Bankr. S.D. Fla. Mar. 27, 2015); *see also In re Trident Shipworks, Inc.*, 247 B.R. 513, 514 (Bankr. M.D. Fla. 2000)(claim estimation may be used for voting and distribution purposes). Under Rule 3018, if an objection to claim is pending, the court temporarily allows the claim "in an amount that the court considers proper for voting to accept or reject a plan." This temporary allowance is necessary because only allowed claims may vote to accept or reject a plan. 11 U.S.C. § 1126(a). So, estimation of an unliquidated or contingent claim under § 502(c) provides for the overall allowance of the estimated claim while an estimation under Rule 3018 is temporary for the discrete purpose of voting.

No matter the purpose, the Court has broad discretion in estimating a claim. *See Matter of Continental Airlines*, 981 F.2d 1450, 1461 (5th Cir. 1993) (estimation of claim is reviewed for abuse of discretion); *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 136 (3d Cir. 1982)(same). No set procedure to estimate a claim exists. *Trigeant Holdings,* 2015 WL 1514175 at *2. Any method best suited given the circumstances involved may be used for claims estimation. *Bittner v. Borne Chemical Co., Inc.*, 691 F.2d 134, 135 (3d Cir. 1982); *Trigeant Holdings,* 2015 WL 1514175, *2. The Court however must abide by the legal rules governing the ultimate value of the claim. *Id*. "For example, when the claim is based on an alleged breach of contract, the court must estimate its worth in accordance with accepted contract law." *Bittner,* 691 F.2d at 135.

The parties do not dispute that estimation of inKind's Claims is necessary. Debtors filed the Objection to Claims and inKind filed the Motion to Estimate for voting and distribution purposes. The Claims are unliquidated and liquidation of the Claims would unduly delay confirmation and ultimately administration of this case. The parties' dispute on estimation involves

9

the amount and status of the Claims. inKind argues that the Court should estimate the Claims in the full amount as filed and secured by Debtors' assets. Debtors argue that the Claims should be allowed at $0 and to the extent any amounts are owed to inKind, these amounts are not secured by Debtors' assets. Both inKind and Debtors base their arguments on the terms of the Agreement.

inKind asserts $11.9 million in credit remains unredeemed across all the Sister Merchants and that under the terms of the Agreement, Debtors are responsible for repayment of the entire amount. Debtors argue that under the Agreement BBR's liability was capped at $5 million and because more than $5 million in credit has been redeemed at their restaurants, Debtors are not responsible for repayment upon default. The Court is tasked with determining the parties' intent by, first, looking to the language of the Agreement.

The Agreement is governed by Delaware law.[39] Established principals of contract interpretation under Delaware law require the court to consider the intent of the parties first by looking at the plain language of the agreement. *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corporation*, 206 A.3d 836, 846 (Del. 2019) ("To determine what contractual parties intended, Delaware courts start with the text"). Delaware courts give effect to the plain meaning of a contract's terms when the contract is clear and unambiguous. *Id*. To assist with interpreting the text's meaning, "Delaware adheres to the 'objective' theory of contracts, i.e. a contract's construction should be that which would be understood by an objective, reasonable third party." *Id*. quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159-60 (Del. 2010). "The contract must also be read as a whole, giving meaning to each term and avoiding an interpretation that would render any term "mere surplusage." *Id*. General terms of the contract, however, must yield to more specific terms. *Sunline Commercial,* 991 A.2d at 846 citing *DCV Holdings, Inc. v.*

---

[39] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 27).

*ConAgra, Inc.*, 889 A.2d 954, 961 (Del. 2005) ("Specific language in a contract controls over general language, and where specific and general provisions conflict, the specific provision ordinarily qualifies the meaning of the general one.").

Under the Agreement, BBR must honor credit sold by its Sister Merchants.[40] The Agreement is otherwise silent as to other obligations BBR may owe inKind respecting credit purchased from the Sister Merchants. No reference is made as to the amount of credit purchased from the Sister Merchants. Likewise, the default language of the Agreement does not reference credit sold by Sister Merchants. Of the four events of default identified in paragraph 16, default by a Sister Merchant is not included. Paragraph 16.b. provides that upon an event of default, liquidated damages will be "calculated by multiplying the dollar amount of *purchased Credit* … not yet sold or redeemed by $0.65." (emphasis added).[41] Credit is defined to mean "electronic credit certificates for specified dollar amounts that may be used to purchase food, beverages, and other goods and services sold by inKind merchant-partners (including items for delivery)."[42] Purchased is not defined but "Purchase Offer" is defined as "a particular offer by inKind to purchase Credit from a merchant."[43]

Paragraph 24 of the Agreement, titled Limitation of Liability, provides that, in any case, BBR's aggregate liability under the agreement is limited to $5 million.[44] This equals the Credit inKind purchased from BBR in the initial offer. BBR contends this limitation of liability language alone means that, upon default, it cannot be held responsible for anything above the $5 million in

[40] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 5.h. and 5.i.).
[41] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 16.b.).
[42] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 1.b.).
[43] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 1.h.).
[44] Debtors' Exh. 3, Proof of Claim Exh. A (Credit Purchase Agreement at ¶ 24.).

Credit it sold inKind which have already been redeemed. The Court agrees with BBR's conclusion but for slightly different reasons.

Considering the plain language of the Agreement as a whole, the Court concludes the parties intended that upon default, BBR would only be responsible for damages based on the unredeemed credit it sold to inKind and not that of their Sister Merchants. Liquidated damages are determined at 65% of "purchased Credit" not yet sold or redeemed. Because purchased modifies Credit, it means something less than Credit which is used elsewhere to describe what BBR must redeem. Purchase is used elsewhere to refer to a specific purchase offer. Considering the lack of any reference to what credit was purchased from the Sister Merchants with the lack of any cross-default or cross-collateralization language, indicates that liquidated damages are only based on the outstanding Credit actually purchased from BBR and not credit purchased from the Sister Merchants. The limitation of liability being capped at the amount of credit purchased from BBR further bolsters this interpretation.

The unrebutted testimony is that over $7 million in credit have been redeemed at Debtors' restaurants.[45] inKind does not dispute Debtors' calculations. Nor has inKind argued or introduced evidence as to whether any credit sold by BBR to inKind (as opposed to credit sold by the Sister Merchants) remain to be purchased or redeemed by consumers. Accordingly, the Court concludes that no damages are owed to inKind under the terms of the Agreement. Under § 502(c) and Rule 3018, inKind's Claim is estimated at $0 for all purposes. Debtors' Objection to Claims is likewise sustained for the reasons stated herein. inKind's Claims are disallowed in their entirety having been satisfied in full by BBR and any liens held by inKind encumbering Debtors' assets shall be

---

[45] Doc. No. 430, 1/27/26 Hr'g Tr. 62:1. Mr. Sirolly testified $8 million of credit had been redeemed, which exceeds the $7 million of credits sold by BBR to inKind.

released.[46] Because the Court has estimated inKind's Claim at $0 for all purposes, the Court need not address whether inKind's Claim are secured.[47]

Having determined that inKind holds an estimated claim of $0 for all purposes, the Court now considers the requirements of §§1125 and 1129 to determine whether final approval of Disclosure Statement and confirmation of the Plan are appropriate.

Approval of the Disclosure Statement

Generally, a debtor may not solicit acceptances of its plan until after transmission of the plan and a Court approved disclosure statement containing adequate information. 11 U.S.C. § 1125(b). Creditors are entitled to receive by mail a copy of the plan and court-approved disclosure statement along with notice of the time fixed for filing objections to the disclosure statement and plan. Fed. R. Bankr. P. 3017 (a) and (d). inKind objects to the Disclosure Statement arguing that it was not properly served on inKind (and perhaps other creditors) by U.S. mail and that it lacks sufficient detail to permit hypothetical reasonable investors to make an informed judgment.

"The purpose of the disclosure requirements in §§ 1123 and 1125 is to allow creditors to cast an informed vote for or against a plan of reorganization." *In re M. Davis Mgmt., Inc.*, No. 6:09-BK-02071-KSJ, 2011 WL 3585821, at *10 (Bankr. M.D. Fla. July 19, 2011). Notice is the bedrock of any procedurally proper case, but the Bankruptcy Code attempts to balance its applicability with practicality. *In re Surfside Resort and Suites, Inc.*, 344 B.R. 179, 187 (Bankr. M.D. Fla. 2006)(citing 11 U.S.C. § 102(1)(A) "notice ... means after such notice as is appropriate

---

[46] Although inKind requested estimation for voting and distribution purposes in the Motion to Estimate, any additional evidentiary hearing or trial on inKind's claims would be futile. The Court finds no ambiguity under the Agreement respecting BBR's $0 liability to inKind with BBR having redeemed credits in excess of $7 million. This would be true even if inKind requested claim estimation for voting purposes only.

[47] If necessary, the Court would conclude inKind does not hold a security interest in Debtors' assets. Debtor Subsidiaries did not execute the Agreement. So, inKind's security interest, if any, would not extend beyond BBR's assets. As to BBR, inKind's interest would be junior to GPEE. Based on the evidence presented at trial, no value remains for inKind's lien to attach. See Debtors' Exh. 2, Liquidation analysis; Doc. No. 430, 1/27/26 Hr'g Tr. 39:23.

in the particular circumstances"). Procedural deficiencies respecting notice of the disclosure statement and plan, including improper solicitation, will not always bar confirmation if such oversights are harmless and creditors still had a meaningful opportunity to review and oppose the disclosure statement and confirmation of the plan. *See In re Berry & Berry Wings, LLC*, Case No. 3:13–bk–5792–JAF2014 WL 6705779 at *4-5 (Bankr. M.D. Fla. Nov. 26, 2014). Notice that is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" will satisfy a creditor's due process rights. *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010)(quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)(internal quotations omitted)).

The Court finds inKind received the Disclosure Statement before and with sufficient time to object to final approval of the Disclosure Statement and confirmation of the Plan. inKind does not dispute it received all other papers in the solicitation package, consisting of the Scheduling Order, Original Plan, order granting motion to combine disclosure statement and confirmation hearing and ballot.[48] Nor does inKind deny that it's counsel received the Disclosure Statement via the Court's CM/ECF software. Instead, inKind asserts Debtors did not serve inKind (and perhaps other creditors) with the Disclosure Statement via U.S. mail as required by the Scheduling Order and Bankruptcy Rules.

At all relevant times during this case, inKind has been represented by counsel who files and receives papers electronically in this case and by doing so, counsel agrees to forego service by

---

[48] inKind's Exh. 20, 21 and 22.

U.S. Mail.[49] The records reflect that on December 9, 2025 counsel for inKind received the Disclosure Statement electronically—three days *before* the solicitation package was mailed.[50] inKind was also apprised of the existence the Disclosure Statement along with the deadlines for creditors to object to the to the Disclosure Statement, and notice of hearing on final approval of the Disclosure Statement by receipt of the Scheduling Order and Plan which occurred via U.S. mail. Before filing its Objection to Confirmation, inKind must have received the Disclosure Statement as one of the grounds raised in its objection is that the Disclosure Statement does not contain adequate information. No evidence is before the Court that other creditors or interested parties did not receive the Disclosure Statement. Considering the foregoing, the Court concludes inKind received the Disclosure Statement and had a meaningful opportunity to review and oppose it. Although inKind received the Disclosure Statement by means other than U.S. mail, inKind's due process rights have not been violated. *See In re Le Centre on Fourth, LLC*, 17 F.4th 1326, 1336 (11th Cir. 2021)(due process does not require precise compliance with the Bankruptcy Rules if the party received actual notice of the information required by the rules). Strict compliance that inKind receive the Disclosure Statement by U.S. mail is not required under these circumstances. The failure to provide inKind with the Disclosure Statement by U.S. mail is harmless. Because counsel for inKind received the Disclosure Statement before any solicitation and inKind had been apprised of a Disclosure Statement within the solicitation package, any solicitation that may have occurred

---

[49] An attorney filing papers with the Bankruptcy Court in the Middle District of Florida must be an Electronic Filing User. Local Rule 1001-2(b). Local Rule 1001-2 (d) provides:

> **Waiver of Service by Mail**. Registration as an Electronic Filing User constitutes (1) waiver of the right to receive notice by first-class mail and the right to service by first-class mail or personal service and (2) consent to receive notice electronically and consent to electronic service, except with regard to service of a summons and complaint on the defendant(s) under Fed. R. Bankr. P. 7004. Waiver of notice and service by first-class mail applies to notice of the entry of an order or judgment under Fed. R. Bankr. P. 9022 and to service of a summons and complaint on debtor's attorney under Fed. R. Bankr. P. 7004(g).

[50] The Disclosure Statement was sent electronically to inKind's attorneys, Esther A McKean and Michael I Goldberg.

before inKind receiving the Disclosure Statement is also harmless. Counsel for inKind had ample time and opportunity to prepare and oppose approval of the Disclosure Statement.

The Disclosure Statement also contains adequate information. "Adequate information" is defined in § 1125(a)(1) as follows:

> (1) "adequate information" means information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information.

11 U.S.C. § 1125(a)(1). The adequacy of information contained within a disclosure statement is determined on a case-by-case basis, "with a view to deciding whether the information in the Disclosure Statement provides creditors with an accurate basis to determine their position on the plan." *In re Ocala Inn Mgmt., Inc.*, Case No. 3:12-bk-2468-PMG, 2013 WL 12461131 at *2 (Bankr. M.D. Fla. May 15, 2013). Valuation of the debtor or an appraisal of debtor's assets is not required for approval of a disclosure statement. 11 U.S.C. § 1125(b).

inKind is the only party objecting to final approval of the Disclosure Statement. inKind argues additional information is needed respecting anticipated recoveries to unsecured creditors, valuation of Debtors' assets, economic benefits to be received by GPEE and Debtors' business efforts. inKind's pleadings and arguments at trial demonstrate that it fully understands the terms of Debtors' Plan. The Disclosure Statement provides what allowed general unsecured claims will receive (*pro rata* distribution of $750,000), when they will receive it (on the effective date) and all

16

contingencies to receiving the distribution (must be allowed unsecured claim).[51] *See In re Keisler*, No. 08–34321, 2009 WL 1851413 *4 (Bankr. E.D. Tenn. June 29, 2009)(quoting *In re Ferretti*, 128 B.R. 16, 19(Bankr. D. N.H. 1991) (disclosure statement "must clearly and succinctly inform the average unsecured creditor what it is going to get, when it is going to get it, and what contingencies there are to getting its distribution.")). Additional information respecting economic benefits that GPEE—a secured creditor—will receive will not assist inKind or other creditors in determining their position on the Plan. Having reviewed the Disclosure Statement and subsequently filed projections and liquidation analysis, the Court finds the Disclosure Statement satisfies the requirements in § 1125 and overrules inKind's objections respecting the Disclosure Statement.

Confirmation of the Plan

Section 1129(a) of the Bankruptcy Code governs confirmation of a plan under chapter 11.[52] Debtors, as plan proponent, must establish the sixteen listed requirements unless §1129(b) applies. *In re Walden Palms Condominium Association, Inc.,* 625 B.R. 543, 548 (Bankr. M.D. Fla. 2020). If Debtors meet all requirements except for paragraph (8), the plan may be confirmed under § 1129(b), provided "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." 11 U.S.C. § 1129(b). Debtors have the burden to prove each element required for confirmation by a preponderance of the evidence. *Walden Palms,* 625 B.R. at 549. inKind argues that Debtors have not met the requirements of §§ 1129(a)(1), 1129(a)(2), 1129(a)(3), 1129(a)(7), 1129(a)(10), 1129(a)(11) and 1129(b)(2) to allow confirmation.

---

[51] Doc. No. 251, Disclosure Statement, Article V.
[52] All references to the Bankruptcy Code refer to 11 U.S.C. §§ 101 *et seq.*

*Section 1129(a)(1) and (a)(2)*

Section 1129(a)(1) and (a)(2) require that the plan and plan proponent [Debtors] comply with the applicable provisions of the Bankruptcy Code. inKind contends that the Plan does not comply with §§1122(a) and 1123(a)(1) respecting treatment of inKind's claims and does not comply with §1125 and Bankruptcy Rule 3017 respecting service of the Disclosure Statement and solicitation of the Plan. As previously discussed, the Court has found inKind received the Disclosure Statement and that inKind's counsel received the Disclosure Statement before any solicitation. There is no evidence that other creditors did not receive the Disclosure Statement, and based on the declaration of Miles Wood and Mr. Shuker's unrebutted testimony, the Court finds the Disclosure Statement was served in accordance with Rule 3017 and this Court's Scheduling Order.[53] To the extent inKind received solicitation of the Plan before receipt of the Disclosure Statement is harmless and not fatal to confirmation. *See In re Berry & Berry Wings, LLC*, Case No. 3:13–bk–5792–JAF, 2014 WL 6705779 at 4 (Bankr. M.D. Fla. Nov. 26, 2014)("While a disclosure statement should typically be approved before the plan proponent solicits votes for the plan, a harmless, premature solicitation is not necessarily fatal to the confirmation process."). As such, the Court finds Debtors and the Plan comply with §1125 and Bankruptcy Rule 3017 respecting service of the Disclosure Statement and solicitation of the Plan.

Regarding treatment of inKind's claims, inKind argues the Plan does not comply with §§1122(a) and 1123(a)(1) which requires a plan "designate…classes of claims,…and classes of interests" subject to placing a "claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." inKind asserts the Plan does

---

[53] The Court also concludes that the incomplete addresses attached to the proof of service did not impact service as the mail was not returned. inKind admits they received the mailing (even though the Disclosure Statement was missing) and no creditors complained the solicitation package was not received. The incomplete addresses appear to be a result of faulty copying for the proof of service and not a service error.

not properly classify its secured and unsecured claims and predetermines the unsecured treatment of its claim. inKind's arguments now appear moot as it holds an unsecured claim of $0. Nevertheless, the Plan provides for inKind's secured claim to the extent it existed in Class 3, which due to senior liens, any allowed amounts would be unsecured. inKind's allowed unsecured claims would be treated in Class 9 along with other creditors holding unsecured claims. inKind's secured and unsecured claims, to the extent they existed, were properly classified in the Plan. The Court finds that the Plan and Debtors have complied with the applicable provisions of the Bankruptcy Code and as a result §1129(a)(1) and (a)(2) have been satisfied.

*Section 1129(a)(3)*

Section 1129(a)(3) mandates that the plan be "proposed in good faith and not by any means forbidden by law." 11 U.S.C. § 1129(a)(3). Although "good faith" is not defined in the Bankruptcy Code, courts construe good faith to mean "a reasonable likelihood exists that the plan will achieve a result consistent with the objectives and purposes of the Code." *In re McCormick*, 49 F.3d 1524, 1526 (11th Cir. 1995). Courts consider whether the debtor intended to abuse the judicial process and the purposes of reorganization. *In re JRV Industries, Inc.*, 344 B.R. 679, 684 (Bankr. M.D. Fla. 2006). But the court's focus should be the plan itself, considering the totality of circumstances surrounding the plan, *McCormick*, 49 F.3d at 1526, including postpetition conduct of the debtor or plan proponent. *In re Proud Mary Marina Corp.*, 338 B.R. 114, 126 (Bankr. M.D. Fla. 2006).

inKind argues by failing to properly mail the Disclosure Statement, Debtors excluded creditors from the disclosure process and as a result, the Plan has not been proposed in good faith. Except for inKind, the Court has no evidence demonstrating that creditors did not receive the Disclosure Statement. Debtors used an approved third-party service to serve the solicitation package, who attested that the package, including the Disclosure Statement were deposited for

delivery by U.S. mail to the parties identified in an attached mailing list. As discussed, inKind's failure to receive the Disclosure Statement by U.S. mail is harmless error. The Court has not discerned in these cases any abuse of the judicial process and the purposes of reorganization. The Court finds that the Plan has been proposed in good faith and not by any means forbidden by law and as a result §1129(a)(3) has been satisfied.

*Section 1129(a)(7)*

Section 1129(a)(7), referred as the "best interest of creditors" test, provides that each holder of a claim or interest in an impaired class must have either accepted the plan or will receive under the plan at least as much as it would have received in a chapter 7 liquidation. Debtors' liquidation analysis, supported by the testimony of Mr. Sirolly, provides that unsecured claims would receive $0 in a chapter 7 and demonstrates that the Plan, which provides allowed unsecured claim holders a pro rata distribution of $750,000 is more than what unsecured claim holders would have received in a chapter 7 liquidation.[54] inKind contends that Debtors' analysis fails because it aggregates Debtors' assets, liabilities, and projected distributions which skews what creditors would have received in each debtor's respective chapter 7 liquidation. inKind, however, did not specify which singular estates would have assets available to creditors holding unsecured claims or how Debtors' liquidation analysis is flawed. The schedules and proofs of claim filed in each of the Debtor Subsidiaries' cases indicate no assets are available for their respective creditors with allowed

---

[54] Doc. No. 430, 1/27/26 Hr'g Tr. 54:10.

unsecured claims.[55]  BBR's schedules and proofs of claim filed in that case indicate the same.[56]

When questioned about the assets and liabilities of a particular debtor, Mr. Sirolly responses

supported that little to no assets would be available for creditors of allowed unsecured claims.[57]

Here, all claim holders voting in the impaired classes voted in favor of the Plan.[58] Debtors'

liquidation analysis and Plan satisfies the best interest of creditors test and §1129(a)(7) has been

satisfied.

*Section 1129(a)(10)*

Section 1129(a)(10) requires that at least one impaired class of claims accepts the plan

determined without including any acceptances by an insider. Although asserted in its objection to

ballot tabulation, inKind contends Debtors' "pooling" of votes masks whether an impaired class

for each debtor has accepted the Plan. inKind does not point to a particular debtor that has not met

this requirement but nevertheless asserts Debtors must isolate their ballot tabulation and

demonstrate each element of §1129 per debtor, and not per plan, citing *In re Consolidated Land*

*Holdings, LLC,* No.6:19-bk-04760-KSJ, 2021 WL 3701799 (Bankr. M.D. Fla. Aug. 20, 2021) for

support.

A split of authority exists as to whether §1129(a)(10) requires acceptance of an impaired

class per debtor or per plan. Compare *Matter of Transwest Resort Properties, Inc.*, 881 F.3d 724

---

[55] Bravo (Louisville), LLC, filed schedules, as amended, listing assets totaling $0, including a liquor license and trade debt totaling $18,000 (Louisville Doc. Nos. 16 and 17). Brio (Cherry Hill), LLC, filed schedules listing assets totaling $1 million consisting of a liquor license and trade debt totaling $61,000 (Cherry Hill Doc. No. 17). However, Libertas Funding also filed proof of claim 9 in Brio (Cherry Hill), LLC asserting $1.5 million is owed under their agreement which is being allowed as a $1.08 million secured claim under the Plan. Brio (Irvine), LLC, filed schedules listing assets totaling $75,000, including a liquor license and trade debt totaling $113,000 (Irvine Doc. No. 18). Brio (Texas), LLC filed schedules as amended listing assets totaling $0, including a liquor license and trade debt totaling $312,000 (Texas Doc. Nos. 20 and 21).

[56] Doc. No. 148.  BBR's Summary of Assets and Liabilities lists assets totaling over $27 million and liabilities exceeding $39 million.

[57] Doc. No. 430, 1/27/26 Hr'g Tr. 80:2; 84:20; 115:7; 116:1; 116:25; 117:17.

[58] Prior to the confirmation hearing, Cherry Hill Town Center Partners, LLC voted in favor of the Plan. *See* Doc. No. 430, 1/27/26 Hr'g Tr. 63:6.

(9th Cir. 2018)(adopting per plan approach); *In re Charter Communications*, 419 B.R. 221, 266 (Bankr. S.D.N.Y. 2009) (per plan basis appropriate); *In re NESV Ice, LLC*, 661 B.R. 427, 445–46 (Bankr. D. Mass. 2024) (per plan) with *In re Tribune Co.*, 464 B.R. 126, 180 (Bankr. D. Del. 2011)(adopting per debtor approach). This Court is not aware of any Eleventh Circuit controlling authority on this issue. Under these circumstances, however, the Court need not take a side. Here, all classes under the Plan are impaired and except for inKind, all voting claim holders within those impaired classes voted in favor of the Plan.[59] Debtors clearly meet this burden under a per plan analysis. With inKind holding an unsecured claim of $0 and all other impaired claim holders voting in favor of the Plan, Debtors are likely to meet the per debtor analysis as well. inKind has presented no evidence to indicate otherwise. The Court is confident that requiring Debtors to resolicit and reopen the voting process would achieve the same result, and therefore, that such exercise is not required under these circumstances.

Although *Consolidated Land* appears to require Debtors to provide a per debtor analysis, that case is not controlling on this Court and the facts are distinguishable. With *Consolidated Land*, jointly administered debtors had engaged in class gerrymandering to obtain a single impaired accepting class in an attempt to satisfy §1129(a)(10). Here, all classes (except for inKind) are impaired, all impaired classes voted in favor of the Plan and all voting claim holders within the impaired classes voted in favor of the Plan. inKind's last minute objections to GPEE's claims filed in Debtor Subsidiaries cases do not affect this analysis, as other impaired classes relating to Debtor Subsidiaries also voted in favor of the Plan.[60] While some owners of GPEE have interests in Holdings, the two entities do not have identical ownership. Nor was there any indication from the evidence presented at trial that confirmation should be deferred to consider equitable subordination

---

[59] See Doc. No. 355. In class 9, general unsecured claims, 17 creditors cast ballots in favor of the Plan.
[60] See Classes 5, 6 and 9.

of GPEE's claim.[61] Except for inKind, Debtors' creditors overwhelmingly support the Plan. The Court finds that the requirements of §1129(a)(10) are satisfied and for the same reasons overrules the objection to ballot tabulation filed by inKind.

*Section 1129(a)(11)*

Often referred as feasibility, § 1129(a)(11) dictates that "[c]onfirmation of the plan is not likely to be followed by the liquidation, or need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan." 11 U.S.C. § 1129(a)(11). This requirement "is designed only to prevent confirmation of 'visionary schemes' that promise a greater distribution than the debtor or plan proponent could ever attain." *In re Bravo Enterprises USA, LLC*, 331 B.R. 459, 474 (Bankr. M.D. Fla. 2005). The proponent must show the plan offers "a reasonable prospect of success and ... is workable." *In re D & G Invs. of W. Florida, Inc.*, 342 B.R. 882, 885 (Bankr. M.D. Fla. 2006).

Debtors have proposed a Plan that continues operations of the Debtors. At the trial, Mr. Sirolly testified Debtors would receive a capital infusion of $4.5 million upon confirmation, that 2026 projections indicated $11 million available to cover plan payments which Debtors supported with their 2025 projections and that the sale of the liquor license should occur within three to six months to fund payment of the allowed unsecured claims.[62] inKind presented no evidence to contradict or rebut this testimony or projections. The Plan offers a reasonable assurance of success based on Mr. Sirolly's testimony and projections.[63] But even if the Court had some doubts respecting feasibility, the better approach is to provide Debtors an opportunity to demonstrate

---

[61] "To determine whether equitable subordination is appropriate, courts assess whether (1) the claimant engaged in some type of inequitable conduct and (2) the misconduct resulted in injury to the creditors of the bankruptcy or conferred an unfair advantage on the claimant." *In re Nilhan Developers, LLC*, No. 21-13820, 2022 WL 3275175 at *5 (11th Cir. Aug. 8, 2022)(internal quotations omitted).

[62] Doc. No. 430, 1/27/26 Hr'g Tr. 48:12; 53:4. Debtors' Exh. 1.

[63] Doc. No. 430, 1/27/26 Hr'g Tr. 53:4. Debtors' Exh. 1.

feasibility by performance. *In re Berry & Berry Wings, LLC*, Case No. 3:13–bk–5792–JAF, 2014 WL 6705779 at *6 (Bankr. M.D. Fla. Nov. 26, 2014) citing *In re Gelin,* 437 B.R. 435, 438 n.9 (Bankr. M.D. Fla. 2010). The Court finds that Debtors' Plan meets the feasibility test under § 1129(a)(11).

*Section 1129(b)*

Section 1129(b) specifies when a plan may be confirmed if all applicable provisions of § 1129(a) are met, except for § 1129(a)(8). Section 1129(a)(8) requires that each class of claims or interests have either accepted the plan or the class is not impaired under the plan. Because the Court has determined that inKind has a claim of $0, the Plan does not impair the claim of inKind. All classes of claims or interests have accepted the Plan. Debtors have met the requirements of §1129(a)(8), so an analysis under §1129(b) is not required.

### Conclusion

The Court has found inKind's claim properly estimated to be valued at $0 based on the language of the Agreement. Even though inKind's standing might be questionable, the Court has considered and rejected inKind's myriad arguments as to why Debtors' Plan should not be confirmed despite being approved by every other voting creditor. Debtors have met the requirements to confirm the Plan under §1129(a). Accordingly, the Court will enter a separate order approving the Disclosure Statement and confirming the Plan. Debtors' counsel is directed to submit proposed orders consistent with this memorandum opinion.

### 

Attorney R Scott Shuker is directed to serve a copy of this order on all interested parties who are non-CM/ECF users and file a proof of service within 3 days of entry of the order.

24