**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**
**www.flmb.uscourts.gov**

**In re:**

**BRAVO BRIO RESTAURANTS, LLC,**

**BRAVO (LOUISVILLE), LLC,**
**BRIO (CHERRY HILL), LLC,**
**BRIO (IRVINE), LLC,**
**BRIO (TEXAS), LLC,**

**Debtors.**
**___________________________________/**

**Case No.: 6:25-bk-05224-LVV**
**Chapter 11**
**LEAD CASE**

***Jointly Administered with:***
**Case No. 6:25-bk-05225-LVV**
**Case No. 6:25-bk-05226-LVV**
**Case No. 6:25-bk-05227-LVV**
**Case No. 6:25-bk-05228-LVV**

**INKIND CARDS INC., INKIND CREDIT FUND LP, AND INKIND WAREHOUSE FACILITY, LLC'S REPLY IN SUPPORT OF AMENDED MOTION FOR RECONSIDERATION**

inKind Cards Inc., inKind Credit Fund LP, and inKind Warehouse Facility, LLC (collectively, "inKind"), by and through undersigned counsel, hereby file this Reply in Support of their Amended Motion for Reconsideration (Doc. No. 555) (the "Amended Motion") and in response to Debtors' Opposition to inKind's Amended Motion for Reconsideration (Doc. No. 556) (the "Opposition"), and state:

Debtors' Opposition mischaracterizes inKind's Amended Motion as a mere attempt to relitigate matters already decided. It is not. The Amended Motion identifies clear errors of law that, left uncorrected, will produce a manifest injustice: the complete elimination of inKind's bargained-for rights under the Credit Purchase Agreement (the "Agreement") based on a fundamental misreading of the Limitation of Liability Provision. The Opposition offers no substantive defense of the Court's interpretation and instead relies entirely on procedural

arguments about finality—arguments that cannot insulate a clearly erroneous ruling from correction under Rule 59(e).

## ARGUMENT

### I. inKind Does Not Merely "Reargue" Previously Decided Issues; It Identifies Clear Error Warranting Reconsideration.

Debtors repeatedly assert that inKind is simply rearguing matters previously decided and seeking "another bite at the apple." (Doc. No. 556 at 3) This characterization is incorrect. Rule 59(e) permits reconsideration to correct a clear error of law or prevent manifest injustice. *See Gulisano v. Burlington, Inc.*, 34 F.4th 935, 945 (11th Cir. 2022). A motion identifying a fundamental misinterpretation of unambiguous contract language is precisely the type of clear error that Rule 59(e) is designed to address. The standard does not require new evidence or new law (those are other available grounds under Rule 59(e))—it requires only that the movant set forth, as the Opposition noted, "strongly convincing" reasons for the Court to change its prior decision. *See* (Doc. No. 556 at 3 n.15).

inKind has done so here. The Court's Opinion concluded that the Limitation of Liability Provision caps the Debtors' total liability under the Agreement at $5 million, effectively treating the ordinary performance of the Agreement—honoring Food and Beverage Credit—as a form of "liability." But as inKind demonstrated in its Amended Motion, credit redemption is not "liability" in any legally cognizable sense; it is the core contractual obligation itself. The Limitation of Liability Provision, by its plain terms, addresses damages arising from breach or other adverse events—not the aggregate value of performance under the Agreement.

The Opposition fails to engage with this argument on the merits. Debtors simply state that the Court "read the plain text" and "concluded the parties intended that, upon default, Debtors would be responsible only for damages based on unredeemed credit they sold to inKind." (Doc.

No. 556 at 5) But repeating the Court's conclusion is not the same as defending it. Debtors offer no explanation for how ordinary credit redemption constitutes "liability" within the meaning of the provision, nor do they address the absurd result their interpretation produces—because they cannot.

## II. Debtors Fail to Address the Absurd Commercial Result Produced by the Court's Interpretation.

inKind demonstrated in the Amended Motion that if the Court's interpretation were correct, the Agreement would effectively self-terminate the moment the Merchant reached $5 million in credit redemptions—a result no commercially reasonable party would agree to. The Opposition dismisses this argument as one the Court already "weighed," stating "[t]he Court was entitled to credit the provision's express aggregate caps and to harmonize the damages, liquidated damages, and liability provisions." (Doc. No. 556 at 5) But Debtors never explain how the Court's interpretation can be "harmonized" with an Agreement that contains no self-termination mechanism upon reaching $5 million in redemptions.

Delaware law is clear: "An unreasonable interpretation produces an absurd result or one that no reasonable person would have accepted when entering the contract." *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010). The Court itself acknowledged that it must adopt the interpretation "which would be understood by an objective, reasonable third party." (Doc. No. 526 at 10 (quoting *Sunline Commercial Carriers, Inc. v. CITGO Petroleum Corp*., 206 A.3d 836, 846 (Del 2019)) No objective, reasonable third party would interpret a limitation of liability provision as capping the total value of performance under a credit redemption agreement, particularly where the Agreement provides no mechanism for termination upon reaching that cap.

### III. The Court's Ruling Is Internally Inconsistent with the Rejection Order.

Debtors argue that "rejection establishes a breach as of the petition date; it does not guarantee damages or dictate their amount." (Doc. No. 556 at 6) While this is a correct statement of law in the abstract, it does not address inKind's actual argument. inKind's point is not that rejection guarantees damages in some particular amount, but rather that a contract cannot simultaneously be "executory"—meaning both parties have remaining material obligations—and give rise to zero damages upon breach. If the Debtors still owed material performance obligations under the Agreement (as the Court found when it deemed the Agreement executory and subject to rejection under § 365), then the breach of those obligations through rejection must produce some cognizable damage.

The Court's rulings are logically incompatible. The Rejection Order (Doc. No. 191) found that the Agreement was executory because both parties had remaining obligations. Yet the Opinion concluded that inKind's claim for damages arising from the breach of those very obligations is zero. Debtors' assertion that these conclusions are "logically compatible" because "contract-based limitations on recovery" can reduce damages to zero (Doc. No. 556 at 6) simply assumes the correctness of the Court's interpretation of the Limitation of Liability Provision—the very issue inKind challenges.

### IV. The Extrinsic Evidence Is Properly Before the Court and Is Not Barred by the Integration Clause.

Debtors argue that inKind's request to present extrinsic evidence is improper because (a) the evidence was always within inKind's possession and could have been offered earlier, and (b) the Integration Clause bars admission of such evidence. (Doc. No. 556 at 4) Both arguments fail.

First, inKind's request to present extrinsic evidence is offered in the alternative—if the Court determines the Limitation of Liability Provision is ambiguous, then extrinsic evidence

should be considered to resolve that ambiguity. inKind's primary position remains that the plain language of the Agreement unambiguously supports its interpretation. The extrinsic evidence, including negotiation redlines showing the parties' intent that the provision apply only in the event of breach, merely confirms what the plain language already establishes.

Second, Debtors' reliance on the Integration Clause is misplaced. The Integration Clause provides that the Agreement "is the entire agreement between [Debtor] and inKind regarding the subject matter of this Agreement" and "supersedes all prior or contemporaneous representations, understandings, agreements, or communications." (Doc. Nos. 422, 367, Ex. 25 at pg. 19 ¶30) An integration clause bars the introduction of prior agreements that would contradict or vary the terms of the written agreement. It does not bar evidence of the negotiation history offered to interpret an ambiguous provision. Under Delaware law, "[i]n construing an ambiguous contractual provision, a court may consider evidence of prior agreements and communications of the parties as well as trade usage or course of dealing." *Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1233 (Del. 1997). "This is true notwithstanding the presence of a routine integration clause. . . ." *Id.* at 1233 n.10. The negotiation redlines and AdobeSign records demonstrate that the parties specifically negotiated the Limitation of Liability Provision with the shared understanding that it would apply only in the event of a breach—not to cap ordinary performance.

Third, the procedural circumstances of this case deprived inKind of a meaningful opportunity to present this evidence. Debtors' Omnibus Objection to inKind's claims was served via thirty-day negative notice on January 19, 2026—just one week prior to the confirmation hearing on January 27, 2026. (Doc. No. 332) The Court ruled on the validity of inKind's claim rather than merely estimating it for voting purposes, without affording inKind the opportunity to present evidence in support of its claim. This is not a case where inKind had a full and fair

opportunity to litigate and simply failed to present available evidence; it is a case where the compressed timeline and procedural posture prevented meaningful presentation of evidence on the interpretation of the Limitation of Liability Provision.

### V. Debtors' Due Process Argument Conflates Participation with Adequate Opportunity.

Debtors assert that inKind's due process claim is "unfounded" because inKind "actively litigated Debtor's rejection of the inKind Agreement, filed an emergency motion to estimate inKind's claims, and vehemently argued against confirmation." (Doc. No. 556 at 4) But participation in a proceeding is not the same as having a fair opportunity to present evidence on the specific issue ultimately decided. The fact that inKind participated in the confirmation process does not mean it had adequate notice that the Court would make a final determination on the merits of its claim based on the Limitation of Liability Provision, rather than merely estimating the claim for voting purposes.

Due process requires that creditors have notice and a meaningful opportunity to be heard before their property interests are adjudicated. *See In re Gen. Dev. Corp.*, 165 B.R. 685, 688 (Bankr. S.D. Fla. 1994). This includes the opportunity to present evidence in support of a creditor's claim. *See*, *e.g.*, *Carey v. Ernst*, 333 B.R. 666, 671-72 (S.D.N.Y. 2005). Where, as here, the Court made a final determination reducing inKind's claim to zero based on contract interpretation, inKind should have been permitted to present evidence—including the negotiation history—bearing on that interpretation.

### VI. Finality Concerns Do Not Override the Need to Correct Clear Error.

Debtors urge that granting reconsideration would "undercut finality, undermine the Debtors' confirmed Plan and would serve only to generate unnecessary administrative costs and delay recovery to creditors." (Doc. No. 556 at 6) While interests in finality are properly considered

in the Rule 59(e) analysis, they do not outweigh the need to correct a clear error of law that results in manifest injustice. The complete elimination of a creditor's claim based on a misinterpretation of a contract provision is the very type of manifest injustice that Rule 59(e) is designed to remedy.

Moreover, the Agreement expressly contemplates that the Debtors and the Sister Merchants—Buca, LLC, PB Restaurants, LLC, and OCS Restaurant Holdings, LLC—collectively signed the Agreements simultaneously and that Food and Beverage Credit was redeemable *pari passu* across all entities. *See* (Doc. No. 555 at 8). The Debtors' share of redeemed credit is well below any cap in the Agreement. Correcting the Court's error will not disrupt the administration of the estate; rather, it will ensure that inKind's claim is properly valued in accordance with the parties' actual agreement.

## CONCLUSION

For the foregoing reasons and those set forth in the Amended Motion, inKind respectfully requests that the Court grant its Amended Motion for Reconsideration, reconsider the Opinion and Confirmation Order, and find as a matter of law that the Limitation of Liability Provision in the Agreement does not limit Debtors' aggregate liability to $5 million, or in the alternative, allow inKind to present extrinsic evidence of the parties' intent with respect to the Limitation of Liability Provision.

Dated: May 8, 2026.

*s/ Esther McKean*
Michael I. Goldberg, Esquire
Florida Bar No.: 886602
201 East Las Olas Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Phone: (954) 463-2700 / Fax: (954) 463-2224
E-mail: michael.goldberg@akerman.com
-and-
Esther McKean, Esq.
Florida Bar No. 028124
**AKERMAN LLP**
420 S. Orange Avenue, Suite 1200
Orlando, FL 32801-4904
Telephone: (407) 423-4000/ Fax: (407) 843-6610
esther.mckean@akerman.com

*Attorneys for inKind Cards Inc., inKind Credit Fund LP, and inKind Warehouse Facility, LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 8th day of May, 2026, I caused the foregoing to be served electronically to those parties receiving CM/ECF notification in this Bankruptcy Case.

.

By: /s/ *Esther McKean*
Esther McKean, Esq.